IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

| | |
|---|---|
| WARREN KEYE, *et al.* | : |
|     Plaintiff | : |
| v. | :   Civil Action No. DKC-07-2926 |
| RED ROOF INNS, INC., *et al.* | : |
|     Defendants | : |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW Plaintiff Warren Keye and Ricki Keye, by and through counsel Peter L. Scherr and Futrovsky, Forster & Scherr, Chartered, and, in support of their opposition to Defendants Red Roof Inns, Inc., Accor North America, Inc. t/a Red Roof Inns, Red Roof Franchising, LLC and RRI Acquisition Co., Inc.'s Motion for Summary Judgment, set forth the Memorandum:

I. **Facts**

A. **The Incident**

On October 14, 2004, Plaintiff Warren Keye (hereinafter "Mr. Keye") was employed as a security guard by Third Party Defendant S&W Protective Services (hereinafter "S&W"). See Exhibit 1, Plaintiff's Answers to Interrogatories at Numbers 1 and 14. On that date, S&W assigned Mr. Keye to work at the Red Roof Inn hotel in Laurel, Maryland (hereinafter "the Hotel"). See Exhibit Number 2, Plaintiff Warren Keye's Deposition at 84, Exhibit Number 3, Defendant Red Roof Inns, Inc.'s Responses to Plaintiffs' Second Set of Requests for Admissions of Genuineness of Documents at Numbers 1, 2 and 4, and Exhibit 4, Defendant Red Roof Inn, Inc.'s Manager's Incident Report. As of October 14, 2004, the Hotel was owned and operated by Defendant Red Roof Inns, Inc.[1] (hereinafter "Red Roof Inns). See Exhibit 5, Defendant Red

---

[1] In its Motion for Summary Judgment, Defendants incorrectly assert that Defendant Red Roof Inns, Inc. was the sole owner and operator of the Hotel. See Motion at n.1. In fact, according to the Maryland State Department of Assessments and Taxation ("SDAT"), on December 14, 1993, Defendant Red Roof Inns, Inc. sold the Hotel to Defendant RRI Acquisition Co., Inc. See Exhibit 6, the SDAT Real Property Data Search results for the Hotel. That being

Roof Inns, Inc.'s Responses to Plaintiffs' First Set of Requests for Admissions of Fact at 1 and 2.

On October 14, 2004, at approximately 9:40 p.m., as Mr. Keye was ascending the stairway immediately outside of the Hotel office, the metal nosing on second step collapsed beneath his foot, thereby causing Mr. Keye to fall.[2] Exhibit 1 at Number 17, Exhibit 2 at 80,84-5,88, 94-101, Exhibit 4 and Exhibit 5 at 3. After Mr. Keye fell, he observed that the lip of the step had peeled back and "was rusted completely out. The lip, when it pulled back, all this top part was completely rusted out. Like the metal separated from the step and broke apart, it was rusted." See Exhibit 2 at 108. See also Exhibit 2 at 95. The entire width of the second step's nosing pulled away from the step. See Exhibit 2 at 108-9.

About a week after the accident, Mr. Keye photographed the subject stairway. See Exhibit 2 at 110-111 and Exhibit 7, Post-Accident Photographs. By that time, however, the second step had already been repaired. See Exhibit 2 at 109-111. Notably, Red Roof Inns failed to photograph the stairway prior to repairing the second step. See Exhibit 8, Deposition of Defendants' Corporate Designee and Custodian of Records John Vandenberge at 81-2 and Exhibit Number 9, Defendants' Responses to Plaintiff's Requests for Production of Documents and Things at 20.

**B.  The Internal Standards of Red Roof Inns, Inc. for Inspecting, Maintaining and Repairing Steel Pan Stairways**

Prior to and on October 14, 2004, Red Roof Inns provided repair and maintenance standards and protocols to each of its inns through a "repairs and maintenance manual" which was available on its intranet. See Exhibit 8 at 13 and 58. Prior to and on October 14, 2004, these standards included:

---

said, should Defendant Red Roof Inns, Inc. stipulate that it will be responsible for a judgment entered against it or its related Defendants, Plaintiffs will voluntarily dismiss their claims against the related Defendants.

[2] The stairway which collapsed beneath Mr. Keye was made of metal pans into which concrete is poured to form the treads (surface) of the steps. The metal pans have a lip which forms a nosing as well as a metal riser which closes the vertical area between steps. After the poured concrete dries, the top of the concrete should align with the nosing of the step. See Exhibit 7, Deposition of Larry Dinoff, AIA at 40,44 and 45 and Exhibit 8, Post-Accident Photos of Subject Stairs.

    i.    An undated section entitled "Steel" which states:

**ROUTINE INSPECTIONS**

> Inn management and the Maintenance-GSR[3] should inspect all exposed exterior steel, stairways, [and] railings . . . on a regular basis (minimum of once a month) for anything that may affect the integrity of the steel. Steel is prone to rust and deterioration. If it occurs, <u>it demands immediate attention</u> in order to prevent major dangerous structural problems . . . .

> See Exhibit Number 8 at 57-58 and Exhibit Number 10, entitled "Steel".

Emphasis in original.

    ii.    Another section entitled "Steel", dated June 15, 1992, which states:

**A. Routine Inspections**

> Inn management and the Maintenance-GSR should inspect all exposed exterior steel, stairways, [and] railings . . . on a regular basis (minimum of once a month) for anything that may affect the integrity of the steel. Steel is prone to rust and deterioration. If it occurs, <u>it demands immediate attention</u> in order to prevent major dangerous structural problems . . . .

**B. Rusting Steel**

> Rusting steel should be cleaned and treated immediately. Remove rust by chipping, scraping, wire brushing (by power and hand) and sanding. Treat steel with RUST BLOCK in accordance with manufacturers written instructions. . . . After RUST BLOCK thoroughly dries, apply finish coat(s) of paint.

                  \*                          \*                        \*

**D. Stairways**

> During the regular inspections, check all stair structures for rust-ing *[sic]* components. Rusting components should be immediately cleaned and treated as specified in the foregoing paragraph B (B. Rusting Steel) and caulk and drill weep holes all work indicated on Exhibit A at the end of the section. *[sic]*. If major steel problems occur, Inn Management should notify the Vice President of Operations . . . .

> See Exhibit Number 8 at 62-63 and Exhibit Number 11, entitled "Steel".

Emphasis in original

---

[3] A Maintenance-GSR is a Maintenance Guest Services Representative. See Exhibit 8 at 59.

3

    iii.    Another Section entitled "Steel", revised in January 1997[4], which states essentially the same thing as the above June 15, 1992, document entitled "Steel". The 1997 revision provides diagrams which set forth repair requirements and also references a video which Red Roof Inns has failed to produce to Plaintiffs. See Exhibit Number 12, entitled "Steel" at 1-3 and 8-9.

**C.    Red Roof Inns' Failure to Produce Any Evidence of Inspections, Maintenance and Repairs on the Subject Stairway**

Red Roof Inns does not possess and has not produced any design drawings or specifications for the subject stairway. Exhibit 8 at 27-28,64,84-85 and Deposition Exhibit 3 at Numbers 23, 24 and 25 and Exhibit 9 at 19. Red Roof Inns acknowledges that it has no evidence of and that there is no way to determine the type of steel from which the subject stairway was made. Exhibit 8 at 63-64. Further, Red Roof Inns does not possess and has not produced any pre- or post-October 14, 2004, photographs of the subject stairway. Exhibit 3 at Numbers 5 and 6, Exhibit 8 at 80-4 and Exhibit 9 at Numbers 19 and 20. Finally, Red Roof Inns does not possess and has not produced any evidence that its agents and/or employees or, for that matter, anyone else, ever performed any inspections, maintenance or repairs on the stairway prior to the October 14, 2004, incident involving Mr. Keye.

As to the lack of evidence concerning inspections of the subject stairway, see Exhibit 3 at Numbers 13-17 and Exhibit 8 at 43, 51 and 74-75. As to the lack of maintenance of the subject stairway, see Exhibit 3 at Numbers 3, 4 and 19-22, and Exhibit 8 at 40, 51-2 and 77.[5] As to the lack of repairs, see Exhibit 3 at Numbers 3, 4, 11, 12 and 23-27, and Exhibit 8 at 38-39 and 77.[6]

---

[4] This document was produced by Red Roof Inns for the first time on November 14, 2008, thereby precluding Plaintiffs' counsel from inquiring about the same at the October 30, 2008, deposition of the Red Roof Inns corporate designee and custodian of records, John Vandenberge.

[5] Red Roof Inns may assert that painting performed at the Hotel in 2002 was stairway maintenance. Notably, the Red Roof Inns Work Order for the 2002 painting fails to mention or require the painting of any stairway. See Exhibit 13, the September 20, 2002, Red Roof Inns, Inc. Standard Work Order for painting of the Hotel.

[6] To the extent that Red Roof Inns asserts that undocumented inspections, maintenance and/or repairs were performed, this Honorable Court should note that Defendants have failed to

4

D.   **The Testimony of Plaintiffs' Expert, Lawrence C. Dinoff, AIA, NCARB**

    i.   The Qualifications of Lawrence C. Dinoff, AIA, NCARB

Plaintiffs have identified Lawrence C. Dinoff, AIA, NCARB as an expert in the fields of commercial building safety, operations and maintenance. In 1970, Mr. Dinoff received a Bachelor's of Science degree in Mechanical Engineering from Renssellaer Polytechnic Institute. In 1979, Mr. Dinoff received a Bachelor's of Architecture degree from Pratt Institute. Between 1980 and 1993, Mr. Dinoff worked as an architect in private practice, designing and providing consulting services for residential and commercial properties. Further, since 1989, Mr. Dinoff has provided forensic consulting services related to building safety and failures. Mr. Dinoff is presently a registered architect in Maryland, Pennsylvania, New Jersey, North Carolina and Delaware. Mr. Dinoff is a member of the American Institute of Architects (AIA) and an AIA liaison to the American National Standards Institute (ANSI). See Exhibit 15, the *curriculum vitae* of Lawrence Dinoff, AIA, NCARB.

Mr. Dinoff is presently the leader of architectural practices group at Robson Forensics, Inc. The architectural practices group focuses upon building construction and premises liability cases. Mr. Dinoff has been previously qualified as an expert the field of evaluation of building conditions related to galvanic and water generated corrosion and deterioration. Mr. Dinoff has been qualified as an expert in the State of Maryland on 15 to 20 occasions. The issue of rust corrosion is within the purview of an architect. Mr. Dinoff has designed stairways with a similar steel pan design to the stairway which is the subject of the captioned matter. See Exhibit 16, Deposition of Lawrence C. Dinoff, at 18-21, 75.

    ii.   The Opinions and Basis for the Opinions of Lawrence C. Dinoff, AIA, NCARB

Before rendering his opinions in this case, Mr. Dinoff:

- reviewed color photographs of the subject stairway taken approximately one week after the subject incident;

---

locate any employee who worked at the Hotel on or before October 14, 2004. See, for example, Exhibit 14, Red Roof Inns' Answers to Plaintiffs' Interrogatories at Number 17 and Exhibit 8 at 69-73.

- personally inspected the subject stairway;
- spoke with Mr. Keye;
- performed a microscopic inspection of paint chips and rust from the subject stairway;
- reviewed the Prince George's County and Laurel City Codes;
- reviewed the applicable provisions of the International Property Maintenance Code, International Building Code and ANSI/ASTM standards;
- *Means Facilities Maintenance Standards*; and
- reviewed the deposition transcript of Mr. Keye and Red Roof Inns discovery responses in the captioned matter.[7]

See Exhibit 16 at 66, 80 and 97, and Exhibit Number 17, the December 14, 2007, Report of Lawrence C. Dinoff, AIA, NCARB.

Mr. Dinoff describes the subject stairway as "a 44" wide steel pain-type stair. . . . The risers and sub-treads are sheet steel, as are the formed nosing closures. The treads are cast in place creating a stair with concrete tread surfaces and sheet steel nosings and risers." Exhibit 17. Mr. Dinoff opines that

> this type of stair is subject to water intrusion along the nosing edges between the metal and the concrete. If steps are not taken to the prevent the water intrusion, rusting and structural deterioration is predictable. When this type of stair is placed outdoors, continuing maintenance is necessary to prevent deterioration of the stair.

*Id.*

Mr. Dinoff acknowledges that steel pan-type stairways are appropriate for exterior use, but only if the property owner performs "regular knowledgeable inspections" and "is committed to rigorous maintenance." Exhibit 16 at 52, 67, 72, and 100-101. Inspections and maintenance are required immediately after selecting this type of stairway for exterior use. Once a property owner places a steel pan-type stairway "outside in an environment where it will get wet and

---

[7] Notably, Red Roof Inns failed to produce Exhibits 10 through 13 until after Mr. Dinoff was required to be designated as an expert and, for that matter, after he was deposed. Plaintiffs, therefore, reserve the right to supplement Mr. Dinoff's opinions after he has an opportunity to review said Exhibits.

where it will be exposed to ice-melting chemicals, . . . you've got a problem and . . . you need to take actions, and that includes as soon as the gap opens up between the metal and the concrete, that you keep that plugged up with sealant." *Id.* at 101. The inspections should focus on the "gap . . . between the concrete and the [steel] pan. If there's any kind of corrosion, rust, water entry along there, you need to wire brush it and get some sealant in there." *Id.* at 72-3. In sum, the property owner must provide a maintenance response immediately if an inspection reveals

> [a]ny sign that water has the capability of getting between the steel and the concrete . . . . because this is at the tread nosing, . . . the actions of people climbing and descending the stair have worn the paint off, so the metal's exposed. So, any sign of exposed metal, any sign of a gap, by the time you see rust, you know that you're really six months late.

*Id.* at 102-3.

Mr. Dinoff opines that several factors affected the timeline for the formation of rust on the subject stairway. The timeline "depends on the type of water to which the steel is exposed, it depends on the quality of the maintenance of the joint between the concrete and the steel, and it depends on what maintenance is done to the steel when the initial signs of rust occur." *Id.* at 65. The lower stairs of subject stairway "were more deteriorated than the upper, because [the lower stairs] are more exposed to the weather than the upper ones." *Id.* at 71. In this case, the timeline from "the first entry of water between the concrete tread and the pans and the formation of rust and then the eventual deterioration to the point where it can break like it did [with Mr. Keye], that's a timeline that takes years." *Id.* at 69. Mr. Dinoff opines

> within a 95 percent certainty that this [deterioration process] took more than a year, more likely than not more than three years, and probably five years or more for that process, and I think that it's reasonably certain that the initiating process started almost at the day that the stair was put in service, because there isn't any sign of the continuing maintenance that was necessary.

*Id.* at 69-70. Mr. Dinoff further opined that, by simply looking at the subject stairway, one can see that it was deteriorated, but not the extent of its structural capacity. One, therefore, should have assumed that the stairway was dangerous. "Certainly someone knowledgeably looking at it would have known a year before and someone knowledgeably looking at it would have known three to five or more years before that it was on that path [to impending failure] unless they did something." *Id.* at 82-3. "This is . . . an extended timeline . . . [the process of rusting] does

7

accelerate, but it doesn't become . . . fast enough that if you're watching, you wouldn't see the signs of damage." *Id.* at 88.

In this case, Mr. Dinoff opines that the "nosings had moved because they were thrust out by rust so that there were places where the tread was higher than the edge of the metal" nosing. *Id.* at 44,92. Despite this gap between the nosing and concrete, and the related obvious rust formation, Mr. Dinoff observed no sign of any maintenance having been performed on the subject stairway. There was no evidence that any sealant had been applied to the subject stairway to seal the gap. *Id.* at 73. Further, after reviewing photographs taken approximately one week after the incident and examining the subject stairway, and looking at paint chips from the stairway under a microscope, Mr. Dinoff concluded that the stairway had not been so much as painted after its 1987 original installation through Mr. Keye's October 14, 2004, fall. *Id.* at 66,78.

In sum, Mr. Dinoff concludes that the subject incident resulted from Red Roof Inns failure to inspect[8], maintain and repair the subject stairway, thereby causing the nosing of the subject stair to become "completely rusted through" and, therefore, collapse under the forces Mr. Keye's "less than 200 pound" weight. *Id.* at 60.

2. **Argument**

A. **The Law of Summary Judgment**

"The burden is on the moving party at the summary judgment stage to show that there is an absence of evidence to support the nonmoving party's position."*Adams v. NVR Homes, Inc.*, 135 F. Supp. 2d 675,686-7 (D. Md. 2001)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317,325, 106 S. Ct. 2548, 91 L. Ed. 265 (1986)). "It is well established that a party moving for summary judgment . . . bears the burden of showing the absence of any genuine issue of material fact and that it is entitled to judgment . . . as a matter of law." *Id.* at 686 (citing *Barwck v. Celotex Corp.*, 736 F.2d 946,958 (4th Cir. 1984)). "The substantive law of the cause of action determines which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,248, 106 S. Ct. 2505, 91 L.

---

[8] Mr. Dinoff specifically testified that "there aren't any inspection reports at all that have been produced. . . . " *Id.* at 61-2.

8

Ed. 202 (1986). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* In analyzing whether a genuine issue of material fact exists, the evidence and reasonable inferences from that evidence must be taken in the light most favorable to the nonmoving party. *Id.* at 255.

In the case *sub judice*, there exist genuine issues of material fact, and therefore, summary judgment is inappropriate. Further, to the extent that genuine issues of material fact do not exist, Defendants are not entitled to judgment as a matter of law. Accordingly, for the reasons set forth *infra*, Defendants' Motion for Summary Judgment should be denied.

### B. Premises Liability Law in Maryland

"It is well-settled that the duty of an owner . . . of land 'depends on the status of the plaintiff at the time of the accident.'" *Tennant v. Shoppers Food Warehouse*, 115 Md. App. 381, 387 (1997)(quoting in part *Casper v. Chas. F. Smith & Son, Inc.*, 316 Md. 573, 578 (1989). "In Maryland, the duty that an owner . . . of land owes to persons entering onto the land varies according to the visitor's status as a *[sic]* invitee (i.e., a business invitee), a licensee by invitation (i.e., a social guest), a bare licensee or a trespasser." *Id.* at 387-88. (citing, among other cases, *Baltimore Gas & Electric Co. v. Lane*, 338 Md. 34, 44 (1995). "The highest duty is owed to a business invitee, defined as one invited or permitted to enter another's property for purposes related to the landowners business." *Id.* at 388 (internal quotations omitted). In this case, it is not disputed that, at the time of the subject incident, Mr. Keye was a business invitee who was on the premises of the Hotel to provide security services pursuant to S&W's contract with Defendants. See Exhibit 1 at Numbers 1 and 14, Exhibit Number 2 at 84, Exhibit Number 3 at Numbers 1, 2 and 4, and Exhibit 4.

"The owner of land . . . has a duty to exercise reasonable care to 'protect the invitee from injury caused by an unreasonable risk' that the invitee would be unlikely to perceive in the exercise of ordinary care for his or her own safety, and about which the owner knows or *could have known in the exercise of reasonable care.*" *Id.* (quoting in part *Casper*, 316 Md. at 582)(emphasis added). "The duties of a business invitor . . . thus include the obligation to warn

9

invitees of known hidden dangers, *a duty to inspect*, and a duty to take reasonable precautions against foreseeable dangers." *Id.* (Emphasis added). That is, the property owner

> must not only use care not to injure the visitor by negligent activities, and warn him of hidden dangers known to the [owner], but *he must also act reasonably to inspect the premises to discover possible dangerous conditions of which he does not know*, and take reasonable precautions to protect the invitee from dangers which are foreseeable from the . . . use of the property.

*Id.* (quoting W. Page Keeton, *et al.*, PROSSER AND KEETON ON THE LAW OF TORTS, §61 AT 425-26 (5TH Ed. 1984).

For example, in *Dickey v. Hochschild, Kohn & Co.*, 157, Md. 448,450 (1929), the Court of Appeals considered the case of a plaintiff, a woman who became injured when the heal of her shoe became stuck in a defective tread on a stairway in defendant's department store. In holding that sufficient evidence was put forth by the plaintiff to permit an inference of negligence on the part of the defendant department store, the Court held that the defendant

> should have should have anticipated that, as a result of the wear and tear to which they would be subjected, the material on the surface of the stairs would at some time become defective, and *ordinary care required it to maintain some system of inspection* which would discover that condition in time to remedy it before it resulted in injury to its customers. . . . [T]o exonerate [the defendant department store] from any responsibility for the condition of the step which caused the accident unless it actually knew of the defect, or unless the Plaintiff showed that it had existed for so long a period that defendant was charged with constructive notice of it, would be in effect to shift the duty of inspection from the storekeeper to the customer.

*Id.* At 452-53 (emphasis added). Notably, the Fourth Circuit has cited *Dickey* with approval. *See Montgomery Ward & Co. v. Bailey*, 271 F.2d 573,576-77 (1959)(affirming the trial court's judgment in favor of a plaintiff who slipped and fell on motor oil in defendant's store).

**C.   Defendants' Motion for Summary Judgment Fails to Acknowledge that Maryland Law Distinguishes Dangerous Conditions Caused From A Defendants' Own Acts or Omissions From Those Caused by Third Parties**

In their Motion for Summary Judgment, Defendants incorrectly posit that, in order to establish negligence, Plaintiffs are required to show that Defendants were on actual or constructive notice of the dangerous condition which ultimately caused Mr. Keye to become injured. Unfortunately for Defendants, the law in Maryland does not support this position. That

10

is, "[t]here is a distinction to be made between those cases which occur as a result of some overt action [or omission] by the [property owner] . . . and those which for convenience have been designated as foreign object, notice type cases. In the first type, *notice is usually not an issue* since the owner or his employees are alleged to have created the dangerous condition." *Keene v. Arlan's Dept. Store of Baltimore, Inc.*, 35 Md. App. 250,256 (1977)(emphasis added). *See also Tennant*, 115 Md. App. at 394 (holding that "the notice issue generally arises when the dangerous condition is created by a third party") and *Link v. Hutzler Bros. Co.*, 25 Md. App. 586,593-94 (1975)(finding that the notice issue is less frequently litigated when a dangerous condition is caused by a property owner as opposed to a third party). In the case *sub judice*, because *Defendants caused the dangerous condition* which ultimately became the sole, direct and proximate cause of Mr. Keye's injuries, there is no requirement that Defendants be placed on actual or constructive notice of that condition.

In this case, Plaintiffs do not allege that a third party created the dangerous condition, the rusted and structurally unsound step which caused Mr. Keye to fall and become injured. To the contrary, Plaintiffs allege and have produced substantial evidence that *Defendants themselves created the dangerous condition* by failing to (a) routinely inspect to stairway in accordance with its own policies and as required by the applicable standard of care, (b) properly maintain the subject stairway by, *inter alia*, preventing a gap from occurring between the steel nosing and concrete tread of the steps which, in turn, would have prevented water and salt intrusion into that gap, (c) properly address rust as it formed by, *inter alia*, utilizing a wire brush to remove the rust and placing sealant where the rust had existed and (d) failing to repair or replace the stairway as it became rusted, deteriorated and dangerous.

     i.    *Defendants' Failure to Inspect the Stairway*

Defendants' internal policies, commencing at latest in 1992, mandate that their personnel "inspect all exposed exterior steel, stairways, railings . . . on a regular basis (minimum of once a month) for anything that might affect the integrity of the steel. Steel is prone to rust and deterioration. <u>If it occurs it demands immediate attention.</u>" See Exhibit 8 at 13,58 and 62-63, Exhibits 10, 11 and 12. Emphasis in original. Defendants' policies specifically state that

11

"[d]uring the regular inspections, check all stair structures for rust-ing *[sic]* components." Exhibits 11 and 12.

Further, Mr. Dinoff[9] opines that, when a property owner erects a steel pan-type stairway such as the one at issue in this case, the owner must perform regular knowledgeable inspections of the stairway commencing immediately after the stairway is put in use. Exhibit 16 at 72. According the Mr. Dinoff, the purpose of these inspections is to look at any gap which may have formed between the concrete and the steel pan to determine whether there is any rust or corrosion. *Id.* at 72-73.

In this case, despite the fact that the subject stairway was located immediately outside of the Red Roof Inns' office, **Defendants have produced _no_ evidence that the stairway was ever inspected**, much less inspected "a minimum of once a month" as mandated by Defendants' own policies. See Exhibit 3 and Numbers 13-17 and Exhibit 8 at 43, 51 and 74-75. This failure to inspect, unto itself, is evidence of Defendants' negligence and, therefore, this Honorable Court should deny Defendants' Motion for Summary Judgment.

    *ii.*    *Defendants' Failure to Maintain and Repair the Stairway*

Defendants' internal policies likewise mandate that, at their properties, any observed "[r]usting steel should be cleaned and treated immediately. Remove rust by chipping, scraping, wire bushing (by power and hand) and sanding. Treat steel with RUST BLOCK . . . . After RUST BLOCK thoroughly dries, apply finish coat(s) of paint." In relation to its stair pan-type stairways specifically, these policies go on to state that "[r]usting components should immediately be cleaned and treated as" aforementioned. Exhibits 11 and 12.

Mr Dinoff's opinions are strongly supported by Defendants' internal policies. Mr. Dinoff

---

[9] In their Motion for Summary Judgment, Defendants contend that Mr. Dinoff's opinion as to the timeline for rust to form on the stairway is not based upon a proper foundation and fails to meet the standards of reliability mandated by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). Motion for Summary Judgment at 7-9. Although Plaintiffs disagree with this contention, the Court should note that Defendants do not argue that Mr. Dinoff is unqualified or lacks the proper foundation to render opinions as to standard of care for inspecting, maintaining and repairing exterior steel pan-type stairs.

opines that steel pan-type stairways, including the subject stairway, require "rigorous maintenance". Exhibit 16 at 101. This maintenance includes being sure that the stairs are properly painted at all time in order to prevent the steel pan and nosing from being exposed to the elements. *Id.* at 66,102-3. This "rigorous maintenance" is required because, once property owners, such as Defendants, place a steel pan-type stairway into an "environment where it will get wet and will be exposed to ice-melting chemicals, . . . you've got a problem and . . . you need to take actions, and that includes as soon as the gap opens up between the metal and the concrete, that you keep that plugged up with sealant." *Id.* at 101. Mr. Dinoff further opines that "[i]f there's any kind of corrosion, rust, water entry along [the gap between the concrete and the steel pan], you need to wire brush it and get some sealant in there." *Id.* at 72-73.

In this case, ***Defendants have produced no evidence that the stairway was ever maintained or repaired*** prior to Mr. Keye's October 14, 2004, incident. See Exhibit 3 at Numbers 3, 4, and 19-22, and Exhibit 8 at 40, 51 and 52. The fact that the nosing on the subject stair collapsed under the weight of Mr. Keye due to rust corrosion is, unto itself, incontrovertible evidence that Defendants failed to maintain and repair the stairway as needed and in accordance with their own policies. Further, had Defendants conducted reasonable inspections of the stairs in accordance with their own policies, Defendants would have known of the rust corrosion and, presumably, would have repaired the stairway. This failure to inspect, maintain and repair the steps is evidence of Defendants' negligence and, therefore, this Honorable Court should deny Defendants' Motion for Summary Judgment. *See, e.g., Ambassador Apartment Corp. v. McCauley*, 182 Md. 275 (1943)(holding that defendant property owner had a duty to maintain a window and window screen in a reasonably safe condition which would have prevented a window screen from falling out and striking plaintiff) and *Riganis v. Mottu*, 156 Md. 340 (1929)(holding that Defendant property owner had a duty to maintain a railing which fell when plaintiff leaned thereon).

D.     **Assuming, *Arguendo*, That This Honorable Court Finds that Defendants Were Required To Be On Actual or Constructive Notice of The Dangerous Condition, They Were on Such Notice**

       i.     *The Dangerous Condition Existed for More Than "a Month"; Therefore,*

13

*Defendants Were on Constructive Notice of the Dangerous Condition*

The subject steel pan-type stairway is located immediately outside of the main office of the Hotel. Exhibit 1 at Number 17, Exhibit 2 at 88 and Exhibit 18, Photographs Taken By Lawrence C. Dinoff, AIA, NCARB. It is undisputed that, for the stair to become "completely rusted out" to the extent that it would collapse under the weight of Mr. Keye, a gap had to form between the steel pan and the concrete tread of the stair, and water and ice melting chemicals had to infiltrate that gap. Exhibit 2 at 108 and Exhibit 16 at 65, 69, 72-73, 101-03. As mentioned in Section 2.C.ii *supra*, Defendants' internal policies mandate that, at *"a minimum of every once every month"*, its personnel were required to inspect all stairways for rust. See Exhibit 8 at 13,58 and 62-63, Exhibits 10, 11 and 12. For this Honorable Court to agree with Defendants' position that they were not on actual or constructive notice of the rusted step, therefore, the Court would need to find that, *within a month* of the step collapse beneath Mr. Keye, a gap formed between the steel pan and the concrete tread, that water and other chemicals infiltrated that gap, and that the steel nosing of the subject step "completely rusted out". This timeline of events is, at best for Defendants, subject to a reasonable dispute and, more likely, completely implausible.

The issue of "whether a [property] owner had knowledge or notice of [a] defective or dangerous condition of its premises is generally for the jury to decide." *Blanco v. J.C. Penney Co.*, 251 Md. 707,714 (1968) and *Stein v. Overlook Joint Venture*, 246 Md. 75,82 (1967). Because a reasonable jury may reasonably infer that the "complete rusting out" of subject stairway took place over a longer period of time than the "minimum of once a month" interval between mandatory stair inspections, this Honorable Court should deny Defendants' Motion for Summary Judgment.

    ii.    *This Honorable Court Should Consider The Opinions of Lawrence C. Dinoff, AIA, NCARB and Find That Notice Existed*

Defendants contend that Mr. Dinoff's opinions as to the timeline for the rusting of stairway should be excluded. In so contending, Defendants assert that Mr. Dinoff's opinions fail to meet the standards of reliability espoused in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786,125 L. Ed. 2d 469 (1993) and *Kumho Tire Co., Ltd. v.*

14

*Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). Motion for Summary Judgment at 7-9. Defendants' attempt to limit Mr. Dinoff's testimony is based upon their assertion that Mr. Dinoff "did not know the type of steel" or "the thickness of the steel"[10] of which the subject stairway was made and that "there are no photographs which show the step at issue was discolored or otherwise defective prior to the date of the occurrence." *Id.* at 8.

Defendants' position is untenable as it seeks to preclude Plaintiffs' expert from testifying based upon Defendants' own failure to produce evidence; i.e., despite repeated requests from Plaintiffs, Defendants have failed to produce:

- any photographs of the subject stairway pre-dating the incident. See Exhibit 3 at Numbers 4, 5 and 6, Exhibit 8 at 80-84 and Exhibit 9 and Numbers 19 and 20;
- any photographs of the subject stairway post-dating the incident. See Exhibit 3 at Numbers 4, 5 and 6, Exhibit 8 at 80-84 and Exhibit 9 and Numbers 19 and 20;
- any design drawing or specifications for the subject stairway. See Exhibit 8 at 27-28,64,84-85 and Deposition Exhibit 3 at Numbers 23, 24 and 25 and Exhibit 9 at 19;
- any evidence as to the type of steel from which the subject stairway was made. Exhibit 8 at 63-64; or
- any documentation of or information about any inspections of, or maintenance or repairs performed on the subject stairs. See *supra* at Section 2.C.i and ii.

Instead, in rendering his opinions, Mr. Dinoff, relied upon all *available* information, including, *inter alia*:

- his review of Mr. Keye's deposition transcript;
- his personal conversation with Mr. Keye;
- the photographs of the stairway taken by Mr. Keye approximately one week after the incident;

---

[10] Notably, Mr. Dinoff testified that, because the rust on the stairs was "so corroded and ... expanded" measuring the thickness of the steel would have been useless. Exhibit 16 at 53-54.

15

- his personal inspection of the stairway;
- his microscopic examination of paint and rust from the subject stairway;
- his review of the applicable codes; and
- his education, and background and experience as a licensed architect for more than 20 years.

Exhibit 17 and Exhibit 16 at 18-21,66. Also, Mr. Dinoff has designed stairways similar to the subject stairway. Exhibit 16 at 75. Mr. Dinoff considers the issue of rust corrosion within the purview of an architect. *Id.* at 22. Further, in the past, Mr. Dinoff has been admitted as an expert "with regard to the evaluation of building conditions which have included galvanic and water-generated corrosion and deterioration. . . ." *Id.* at 21.

Under *Kumho*, this Honorable Court is not required to, but "may" consider one or more of the *Daubert* factors "when doing so will help determine [non-scientific expert] testimony's reliability." *Kumho*, 526 U.S. at 141. "[T]he test of reliability is flexible and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court . . . broad latitude . . . in respect to its ultimate reliability determination." *Id.* at 141-42 (internal quotations omitted). "[T]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 150.

In this case, Mr. Dinoff's testimony as to how long it took the subject stairway to become rusted to the point of corrosion is well within the purview of an architect's expertise, especially an architect who has designed this type of stairway during his career. Further, Mr. Dinoff's opinion testimony as to how long it took for the subject steel pan-type stairway to rust is the type of testimony which is non-scientific in nature and, therefore, not based upon scientific theories and principles. Mr. Dinoff's opinion testimony as to the duration of the rusting process, therefore, is precisely the type of testimony to which the *Daubert* factors are impertinent and, therefore, should not be applied.

Further, due to Defendant's failure to produce any pre- or post-incident photographs of the subject stairway, any design drawings or specifications for the subject stairway, any

16

Case 8:07-cv-02926-WGC  Document 38-1  Filed 11/17/08  Page 17 of 20

information or documentation about the type of steel used to make the stairway, or any information or documentation about any inspections, maintenance or repairs performed on the stairway, Mr. Dinoff has utilized all available resources to render his opinions in this case. This Honorable Court should not permit Defendants to rely upon their failure to produce evidence as a basis for excluding a portion of Mr. Dinoff's opinion testimony. In its broad discretion, this Honorable Court should not apply the *Daubert* factors and should permit Mr. Dinoff to testify as to his opinions as to the length of time which it took for the rust to form and during which the stairway was "dangerous and deteriorated".

In sum, Mr. Dinoff's opinion is that the subject stairs were "dangerous and deteriorated years" before the subject incident. ". . . . [T]he timeline between the . . . first entry of water between the concrete tread and the pans and the formation of rust and then the eventual deterioration to the point where it can break like it did, that's a timeline that takes years." Exhibit 16 at 69. Mr. Dinoff explained that

> within a 95 percent certainty that this [deterioration process] took more than a year, more likely than not more than three years, and probably five years or more for that process, and I think that it's reasonably certain that the initiating process started almost at the day that the stair was put in service, because there isn't any sign of the continuing maintenance that was necessary.

*Id.* at 69-70. This one to five year interval from the date of the gap formation between the metal pan and the concrete tread until the date of the subject incident certainly would have placed Defendants on constructive notice of the dangerous condition. This is especially true if Defendants had complied with their own requirements and inspected the stairway "a minimum of once a month".

Based upon the foregoing, and taking the facts and inferences therefrom in the light most favorable to Plaintiffs, this Honorable Court should find that Defendants were on actual or constructive notice of the dangerous condition causing Mr. Keye to fall and, therefore, should deny Defendants' Motion for Summary Judgment.

E.   ***Res Ipsa Loquitur***

Finally, Plaintiffs may elect to proceed at trial under the doctrine of *res ipsa loquitur* and, thereby, avoid having to prove that Defendants had actual or constructive notice of the dangerous

17

condition which caused Mr. Keye's injury. Plaintiffs may invoke the doctrine of *res ipsa loquitur* if (1) it appears that an accident was of such a nature that it would not ordinarily occur without defendant's negligence, (2) the plaintiff demonstrates that the apparatus or instrument which caused the injury was in the defendant's exclusive control and (3) it appears that no action on the part of the plaintiff or a third party or other intervening force may have caused the injury. *Blankenship v. Wagner*, 261 Md. 37, 42 (1971). As to the second element, control, the Maryland Court of Appeals has said that

> evidence of complete control is not required. It may be established by evidence sufficient to warrant an inference of its existence, and circumstantial evidence may suffice. The Plaintiff is not required in his proof to exclude remotely possible causes and reduce the question of control to a scientific certainty.

*Liedenfrost v. Atlantic Masonry, Inc.*, 235 Md. 244, 250 (1964) and *Norris v. Ross Stores, Inc.*, 159 Md. App. 323, 332 (2004). Maryland courts have held that the

> requirement of exclusive control as it is generally applied is more accurately stated as one that the evidence must afford a rational basis for concluding that the cause of the accident was probably such that the defendant would be responsible for any negligence connected with it. That does not mean that the possibility of other causes must altogether be eliminated, but only that their likelihood must be so reduced that the greater possibility lies at the defendant's door.

*Norris*, 159 Md. App. at 332-33 (quoting *C&P Telephone of Maryland v. Hicks*, 25 Md. App. 503, 530 (1975)(internal quotations omitted). Further, in order to establish exclusive control, there is no requirement that the apparatus causing the injury be installed by the defendant. *Id.* at 334. Finally, the doctrine of *res ispa loquitur* may be applied to a situation in which a defendant failed to reasonably maintain the apparatus of the injury. *Id.*

In *Blankenship*, the Maryland Court of Appeals considered a factually apposite situation to that in the case *sub judice*. There, the plaintiff and a co-worker ascended a stairway at defendant's residence in order to deliver a refrigerator. *Blankenship*, 261 Md. at 39-40. After the plaintiff had reached the porch located at the top of the stairway, the second step collapsed beneath the co-worker, thereby causing injury to the plaintiff. *Id.* In reversing a directed verdict for the defendant homeowner, the Court held that "[t]he instant case does not fall neatly into the 'classic pattern' of *res ipsa* cases in which someone is struck by a falling object . . . . Nonetheless, it comes within the ambit of the doctrine and similar situations are not unknown to

tort law in this country." *Id.* at 42-43. The Court of Appeals went on to cite with approval cases in foreign jurisdictions:

> In the case of *DiMare v. Cresci*, 377 P.2d 860 (Cal. 1962) a woman descending an exterior stairway in her apartment house was injured when one of the steps collapsed and she fell through. The court held that *res ipsa loquitur* was applicable, stating that steps do not ordinarily collapse unless the person having the duty to maintain and inspect them was negligent. In the earlier case of *Katz v. Goldring*, 260 N.Y.S. 796 (Sup. Ct. App. Div. 1932), the New York Court *[sic]* held . . . that *res ipsa loquitur* applied when a plumber's helper who was moving a washtub out of an apartment in the defendant's tenement house was injured as he paused to rest on a landing and it collapsed.

*Blankenship*, 261 Md. at 43. The *Blankenship* Court went on to state that "the plaintiff proved the construction, maintenance and exclusive control of the steps to be within the dominion of the defendant. There is nothing in the evidence which tends to rebut the inference of negligence on the part of the defendant or to introduce a third party or other intervening factors into the case." *Id.* at 44. The Court continued, "we are of the opinion that this [step collapse] accident was not the kind which would ordinarily occur unless someone was negligent in constructing, maintaining or inspecting the steps in question." *Id.* at 47. Based upon the foregoing, the Court held that "what the plaintiff has proved shifted the burden to the defendants to come forward and explain that there was no negligence on their part which was the proximate cause of the accident." *Id.* at 45.

In the case *sub judice*, the subject stairway was built for Defendants according a Defendants' specifications. Exhibit 8 at 64-65. Within the meaning of Maryland law, because Defendants have put forth no evidence of any possible intervening cause of the rusting, corroded, dangerous stairway, Defendants had exclusive control over the stairway from the time it was built until the time of the subject incident. Further, there is no evidence that Plaintiff or a third party caused Mr. Keye's injury. Because the collapsing of the subject step beneath Mr. Keye was not the kind of accident "which would ordinarily occur unless someone was negligent in constructing, maintaining or inspecting the steps in question . . . . [t]he burden [has shifted] to the defendants to come forward and explain that there was no negligence on their part which was the proximate cause of the accident." *Blankenship*, 261 Md. at 45, 47. This the defendants have failed to do.

Because Plaintiffs may elect to go forward at trial under the doctrine of *res ispa loquitur* and, therefore, obviate any notice requirement which may exist (and which Plaintiff specifically denies to exist), this Honorable Court should deny Defendants Motion for Summary Judgment.

### 3. Conclusion

Based upon the foregoing, taking the facts of the case and the inferences therefrom in the light most favorable to Plaintiffs, Plaintiffs hereby request that this Honorable deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

FUTROVSKY, FORSTER & SCHERR, CHTD.

_____
Peter L. Scherr (Bar No. 12539)
77 South Washington Street, First Floor
Rockville, Maryland 20850
(301) 251-8500
Counsel for Plaintiffs